[Cite as *In re L.D.*, 2012-Ohio-1810.]

COURT OF APPEALS
STARK COUNTY, OHIO
FIFTH APPELLATE DISTRICT

|  |  |  |
|---|---|---|
| IN THE MATTER OF: | : | JUDGES: |
|  | : | W. Scott Gwin, P.J. |
|  | : | John W. Wise, J. |
| L.D. | : | Julie A. Edwards, J. |
|  | : |  |
|  | : | Case No. 2012CA00006 |
|  | : |  |
|  | : |  |
|  | : | O P I N I O N |

CHARACTER OF PROCEEDING:         Civil Appeal from Stark County
Court of Common Pleas, Family
Court Division, Case No.
2009JCV01027

JUDGMENT:         Affirmed

DATE OF JUDGMENT ENTRY:         April 23, 2012

APPEARANCES:

For Plaintiff-Appellee         For Defendant-Appellant

JERRY A. COLEMAN         VERNON M. INFANTINO
Stark County Job and         Schnars, Baca & Infantino, LLC
Family Services         610 Market Avenue, North
221 Third Street, S.E.         Canton, Ohio  44702
Canton, Ohio  44702

*Edwards, J.*

{¶1} Appellant, Crystal Dickson, appeals from the December 14, 2011, Judgment Entry of the Stark County Court of Common Pleas, Family Court Division, terminating her parental rights and granting permanent custody of L.D. to Stark County Department of Job and Family Services.

<u>STATEMENT OF THE FACTS AND CASE</u>

{¶2} Appellant is the biological mother of L.D. (DOB 8/4/09). She is not married to L.D.'s father. On August 7, 2009, Stark County Department of Job and Family Services (SCDJFS) filed a complaint alleging that L.D. was a dependant and/or neglected child. The agency requested that the child be placed in the temporary custody of her maternal aunt with protective supervision by the agency.

{¶3} On September 2, 2009, after appellant and L.D.'s father stipulated to a finding of dependency, L.D. was found to be a dependent child and she was placed in the temporary custody of a relative with protective supervision by SCDJFS. On October 13, 2009, L.D. was placed in the temporary custody of SCDJFS.

{¶4} Thereafter, on June 28, 2011, SCDJFS filed a motion requesting permanent custody of L.D. A hearing on such motion commenced on November 14, 2011. The following testimony was adduced at the hearing.

{¶5} Wanda Pounds, the ongoing social worker with SCDJFS, testified that she had been involved with the family since August of 2009. She testified that the agency had had previous involvement with the family and that custody of appellant's two other children from a different father had been granted to a relative after appellant agreed to such placement. Pounds testified that at the time of L.D.'s birth, appellant was not

raising her other children and that the agency believed that appellant had not addressed any of the agency's concerns about her. According to Pounds, the agency was concerned about appellant's cognitive abilities as well as domestic violence issues she had with the father of her other children. At the time of L.D.'s birth, appellant was still involved with such person.

{¶6} Pounds testified that L.D. had been placed in the custody of appellant's sister, but that in October of 2009, the sister had been arrested for domestic violence and custody of L.D. was transferred to the agency. L.D. had been in continuous custody of the agency since October 13, 2009, and was still residing in the same foster home as she was placed in at such time.

{¶7} According to Pounds, the agency developed a case plan for appellant. The plan required both appellant and L.D.'s father to complete a parenting psychological evaluation at Northeast Ohio Behavioral Health and get drug assessments at Quest. Appellant completed the Quest assessment. Pound's testified that the parents completed the parenting evaluations and that, with respect to appellant's evaluation, there were no recommendations for further services. The following is an excerpt from Pounds' testimony:

{¶8} "Q. Okay. Now, you indicated mom. I just want to be sure. Mom did not have any recommendations then on her parenting evaluation. Is that correct?

{¶9} "A. No, she did not.

{¶10} "Q. And as such, was mother, was it, were any other services offered to mother at that point?

**{¶11}** "A. Um…I connected her with BBR [Bureau of Vocational Rehabilitation] Um…just because I, I didn't know what else to do.  I know that um…they did an assessment but I don't think anything ever came of that for services for her.  Um…but she has been approved for social security benefits.

**{¶12}** "Q. Based upon her cognitive limitations?

**{¶13}** "A. Yes.

**{¶14}** "Q. Has mother told you, verbalized to you, if she is interested in regaining custody of this child?

**{¶15}** "A. Um…at the beginning of the case, she had said that she was comfortable with her daughter being with her sister.  And at that point, she was fine with everything staying the way it was, so that she could see her daughter.

**{¶16}** "Q. Is the sister in the same foster home?

**{¶17}** "A. No, 'her' sister, who had custody.

**{¶18}** "Q. Oh…I'm sorry.  I'm sorry.

**{¶19}** "A. At the beginning.

**{¶20}** "Q. Alright.  So, she was comfortable with her sis, mom's sister, the aunt, keeping custody of the child?

**{¶21}** "A. Right.

**{¶22}** "Q. When the child was placed into the Agency's custody, did mother (inaudible) an opinion as to whether she was desiring of, of return of custody at that point?

**{¶23}** "A. Um…no, she never really spoke of it, although she did stipulate at the um…previous permanent custody hearing.  But um…in her psych eval., she had said that she didn't want full time care.

**{¶24}** "Q. What did she, what did she want?  If you know.

**{¶25}** "A. Just to be able to see her daughter." Transcript of November 14, 2011 hearing at 17-18.

**{¶26}** Pounds testified that appellant had been visiting L.D. regularly and that L.D. was very comfortable with appellant. She further testified that she felt that she had assisted the family with trying to complete the case plan services and that appellant had not fully completed the same.

**{¶27}** On cross-examination, Pounds testified that no court case was filed with respect to appellant's two other children, but that appellant had agreed to have such children placed with a relative.  Pounds testified that appellant completed her assessment at Quest and Northeast Ohio Behavioral Health and that she made her own appointments and arranged her own transportation to the appointments. She testified that she referred appellant to the Bureau of Vocational Rehabilitation and that appellant did not qualify for any of the programs.  Pounds testified that appellant lived by herself and that she was receiving social security. She further testified that appellant and L.D. were bonded.  When asked if she ever on her own recommended services, Pounds indicated that she sometimes did but, she did not do so in this case.

**{¶28}** On redirect, Pounds testified that she could not in good conscience reunify L.D. with either parent. She testified that when placement of L.D. with appellant's sister did not work out, appellant told Amy Thomas at her parenting evaluation that she just

wanted to visit L.D. and that appellant had never told her that she had changed her mind and wanted to be a full time mother to L.D. Pounds testified that appellant had never asked for services or for more visitation and that appellant visited with L.D. twice a month for two hours at a time. Pounds testified that L.D. had never been in either of her parent's homes and that she would have a big adjustment if she was placed with her parents.

{¶29} Amy Thomas, a psychology assistant at Northeast Ohio Behavioral Health, testified that appellant had participated in a parenting evaluation with her in October of 2009, and that appellant had significant problems with her cognitive ability. Thomas testified that appellant had a verbal IQ of 62, a non-verbal IQ of 70 and that her full scale IQ was 61. According to Thomas, appellant was functioning at the level of a nine year old in terms of verbal skills and a 71/2 year old in terms of non-verbal skills. According to Thomas, appellant would need a great deal of assistance in raising a child because she needed someone with her to "supervise her judgment in reasoning. To assist her with maintaining basic life activities…" Transcript of November 14, 2011 hearing at 36. Thomas testified that appellant would need assistance every day all day long.

{¶30} When she was asked why she made no recommendations for reunification, Thomas testified as follows:

{¶31} "A. You know, at the time I met with [CRYSTAL DICKSON], she was very ambivalent about the idea of working a case plan towards regaining the child. So, she was really questioning whether or not she wanted to complete the case plan. She didn't know whether or not she wanted to maintain custody of this child. Um…she recognized

it was very difficult to raise a child which would be an accurate assessment. Um…in addition, at the time [Crystal Dickson] had reconciled with the father of two older children. Um…who she had lost custody of. The, the children were placed in the permanent custody of their paternal grandmother. Um…this individual, according to [Crystal Dickson] has continued to drink alcohol excessively. He has a criminal history. There were clear concerns that this is her live in partner and yet this person would not be able to provide her the support that she needed to parent this baby effectively or appropriately. So, at the time I met with her, not only were the concerns with the IQ but the lack of appropriate support system enabling her to raise a baby in a safe and competent manner. When there's concerns with attachment and bond, there's going to be concerns with her commitment and follow through towards appropriately parenting the child, as well." Transcript of November 14, 2011 hearing at 37-38.

{¶32} Thomas further testified that she diagnosed appellant with dependent personality disorder, and that appellant's relationship with her current paramour was dysfunctional and that there had been domestic violence.

{¶33} On cross-examination, Thomas testified that she initially saw appellant in April of 2008 and that, at such time, she had recommended Goodwill Home Based Help Me Grow and individual counseling. She admitted that she indicated in a 2008 report that appellant was likely to cooperate with services provided by Community Health. The following testimony was adduced when she was asked what had changed her mind about appellant in the past 18 months:

{¶34} "A. Um…the difference is in terms of her attachment and motivation to, towards completing a case plan. Again, the ambivalence was critical to me, towards

commitment. In addition to that, she previously was given this case plan but was unable to regain custody of two previous children. So, despite um...working towards regaining custody of those children, she could not do it. So, that really reflects concerns with her ability based on her IQ and support system, um…in order to successfully parent two other children." Transcript of November 14, 2011 hearing at 43.

{¶35} Thomas testified that appellant still wanted to maintain visits with her daughter and that her concerns that appellant would have problems learning things were the same that she had in 2008. Thomas testified that she was not aware that appellant had her own housing and was receiving Social Security.

{¶36} At the hearing, appellant testified that she lived in an apartment and was currently on social security. She testified that her mother, who was her payee, helped her pay her bills and that she wanted custody of L.D. and loved her. Appellant testified that she would do whatever SCDJFS asked her to do to obtain custody.

{¶37} On cross-examination, appellant testified that she had changed her mind about having custody of L.D. after her sister lost custody of L.D., but that she did not tell anyone that she wanted custody rather than just visitation. Appellant also testified that she would need help raising L.D. Appellant further testified that she was living with her boyfriend. After she was referred to the Bureau of Vocational Rehabilitation, appellant called them once and, after they did not answer their phone, gave up on the bureau. Appellant testified that her daughter seemed happy and was doing well in foster care. When asked what she would do if she got L.D. that day, appellant testified that she would get a bigger house and take care of her. She testified that she required a lot of assistance from her mother.

{¶38} The best interest hearing was held on December 14, 2011. At the hearing, Pounds testified that L.D., who had been in the agency's continuous temporary custody since October 13, 2009, did not have any developmental, medical, behavioral or special education needs. She testified that L.D. had been in the same foster care since October 13, 2009 and was bonded with her foster family. Pounds testified that the foster family wanted to adopt L.D. and that the agency had investigated all possible family members, but that none was suitable. Pounds testified that appellant's visits with L.D. went well and that there was a bond between L.D. and her biological parents. When asked why she thought that permanent custody would be in L.D.'s best interest, Pounds testified as follows:

{¶39} "A. Um…although there is a bond with these parents, the parents have continual bad choice, make continual bad choices.  Um…mom is cognitively limited.  Um…she has expressed that she didn't want her daughter, she was fine with her being with her sister.  But now she's saying she wants her home.  Um…there were no services offered on her psychological evaluation.  Um…we've tried, in her past cases and it's not made enough of a difference.  Um…during this case, there's been two incidences of domestic violence involving her as the victim.

{¶40} "Q. Who mom?

{¶41} "A. Yes."  Transcript of December 14, 2011 hearing at 8.

{¶42} On cross-examination, Pounds was questioned about L.D.'s grandmother who had custody of appellant's two other children.   She testified that the grandmother had no income, had multiple liens against her and also that she had two adult sons living with her who had multiple felonies. Pounds testified that appellant and her

daughter were bonded and that while appellant completed services, it was "not to the standard that would allow her to keep her other two kids." Transcript of December 14, 2011 hearing at 11. Pounds admitted that appellant completed her psychological parenting evaluation, had housing and had an income.

**{¶43}** Pursuant to a Judgment Entry filed on December 14, 2011, the trial court terminated appellant's parental rights and granted permanent custody of L.D. to SCDJFS. On the same date, the trial court filed Findings of Fact and Conclusions of Law.

**{¶44}** Appellant now appeals from the trial court's December 14, 2011 Judgment Entry, raising the following assignments of error on appeal:

**{¶45}** "I. THE JUDGMENT OF THE TRIAL COURT THAT THE MINOR CHILD CANNOT OR SHOULD NOT BE PLACED WITH APPELLANT WITHIN A REASONABLE TIME WAS AGAINST THE MANIFEST WEIGHT AND SUFFICIENCY OF THE EVIDENCE.

**{¶46}** "II. THE JUDGMENT OF THE TRIAL COURT THAT THE BEST INTERESTS OF THE MINOR CHILD WOULD BE SERVED BY THE GRANTING OF PERMANENT CUSTODY WAS AGAINST THE MANIFEST WEIGHT AND SUFFICIENCY OF THE EVIDENCE."

I, II

**{¶47}** Appellant's two assignments of error are related and shall be addressed together. In her first assignment of error, appellant argues that the trial court's finding that L.D. could not and should not be placed with appellant within a reasonable time was against the manifest weight and sufficiency of the evidence. In her second

assignment of error, appellant argues that the trial court erred in finding that permanent custody to SCDJFS was in L.D.'s best interest. Appellant argues that this finding was against the manifest weight and sufficiency of the evidence.  We disagree.

**{¶48}** "Permanent Custody" is defined as "[a] legal status that vests in a public children services agency or private child placing agency, all parental rights, duties and obligations, including the right to consent to adoption, and divests the natural parents or adoptive parents of all parental rights, privileges, and obligations, including all residual rights and obligations."  R.C. 2151 .011.

**{¶49}** A trial court's decision to grant permanent custody of a child must be supported by clear and convincing evidence. The Ohio Supreme Court has defined "clear and convincing evidence" as "[t]he measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the allegations sought to be established. It is intermediate, being more than a mere preponderance, but not to the extent of such certainty, as required beyond a reasonable doubt, as in criminal cases." *Cross v. Ledford*, 161 Ohio St. 469, 477, 120 N.E.2d 118 (1954); *In re: Adoption of Holcomb*, 18 Ohio St.3d 361, 481 N.E.2d 613 (1985).

**{¶50}** In reviewing whether the trial court based its decision upon clear and convincing evidence, "a reviewing court will examine the record to determine whether the trier of facts had sufficient evidence before it to satisfy the requisite degree of proof." *State v. Schiebel*, 55 Ohio St.3d 71, 74, 564 N.E.2d 54, 60 (1990).  See also, *C.E. Morris Co. v. Foley Constr. Co.*, 54 Ohio St.2d 279, 376 N.E.2d 578 (1978). If the trial court's judgment is "supported by some competent, credible evidence going to all the

essential elements of the case," a reviewing court may not reverse that judgment. *Schiebel,* 55 Ohio St.3d at 74.

**{¶51}** Moreover, "an appellate court should not substitute its judgment for that of the trial court when there exists competent and credible evidence supporting the findings of fact and conclusion of law." *Id.* Issues relating to the credibility of witnesses and the weight to be given the evidence are primarily for the trier of fact. As the court explained in *Seasons Coal Co. v. Cleveland* , 10 Ohio St.3d 77, 80, 461 N.E.2d 1273 (1984):

**{¶52}** "The underlying rationale of giving deference to the findings of the trial court rests with the knowledge that the trial judge is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony."

**{¶53}** Moreover, deferring to the trial court on matters of credibility is "crucial in a child custody case, where there may be much evident in the parties' demeanor and attitude that does not translate to the record well." *Davis v. Flickinger*, 77 Ohio St.3d 415, 419, 1997-Ohio-260, 674 N.E.2d 1159.

**{¶54}** Pursuant to 2152.414(B)(1), the court may grant permanent custody of a child to the movant if the court determines "that it is in the best interest of the child to grant permanent custody to the agency that filed the motion for permanent custody and that any of the following apply:

**{¶55}** "(a) The child is not abandoned or orphaned or has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two month period

on or after March 18, 1999, and the child cannot be placed with either of the child's parents within a reasonable period of time or should not be placed with the child's parents.* * *

**{¶56}** "(d) The child has been in the temporary custody of one or more public children service agencies or private child placing agencies for twelve or more months of a consecutive twenty-two month period…"

**{¶57}** Revised Code 2151.414(E) sets forth the factors a trial court must consider in determining whether a child cannot or should not be placed with a parent within a reasonable time. If the court finds, by clear and convincing evidence, the existence of any one of the following factors, "the court shall enter a finding that the child cannot be placed with [the] parent within a reasonable time or should not be placed with [the] parent":

**{¶58}** "(1) Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parent to remedy the problem that initially caused the child to be placed outside the home, the parents have failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home. In determining whether the parents have substantially remedied those conditions, the court shall consider parental utilization of medical, psychiatric, psychological, and other social and rehabilitative services and material resources that were made available to the parents for the purpose of changing parental conduct to allow them to resume and maintain parental duties.* * *

**{¶59}** "(16) Any other factors the court considers relevant."

**{¶60}** A trial court may base its decision that a child cannot or should not be placed with a parent within a reasonable time upon the existence of any one of the R.C. 2151.414(E) factors. The existence of one factor alone will support a finding that the child cannot be placed with the parent within a reasonable time. See *In re: William S.*, 75 Ohio St.3d 95, 1996-Ohio-182, 661 N.E.2d 738.

**{¶61}** Pursuant to R.C. 2151.414(D), in determining the best interest of a child, the court shall consider all relevant factors, including but not limited to the following:

**{¶62}** "(a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster care givers and out-of-home providers, and any other person who may significantly affect the child;

**{¶63}** "(b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;

**{¶64}** "(c) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period…;

**{¶65}** "(d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;* * * "

**{¶66}** In the case sub judice, the trial court made findings pursuant to R.C. 2151.414(B)(1)(a) and R.C. 2151.414(B)(1)(d). As findings under R.C. 2151.414(B)(1)(a) and R.C. 2151.414(B)(1)(d) are alternative findings, each is independently sufficient to use as a basis to grant the motion for permanent custody. *In*

*re Langford Children,* 5th Dist. No. 2004CA00349, 2005–Ohio–2304, ¶17; *In re Dalton,* 5th Dist. No. 2007 AP 0041, 2007–Ohio–5805, ¶ 88.  Appellant has not challenged the trial court's finding that L.D. has been in the agency's custody for 12 or more months in a consecutive 22 month period. R.C. 2151.414(B)(1)(d). The record established that L.D. had been in the agency's continuous custody from October 13, 2009, until the date of the hearing on December 14, 2011. This finding alone, in conjunction with a best interest finding, is sufficient to support the grant of permanent custody.  See *In re N.D.,* 5th Dist. No. 2010CA00334, 2011-Ohio-685.

**{¶67}** In addition, the evidence supported the trial court's conclusion that L.D. could not and should not be placed with appellant within a reasonable period of time. R.C. 2151.141(B)(1)(a). The evidence established that appellant, who had serious cognitive limitations, was diagnosed with dependent personality disorder and requires assistance with basic daily activities. Moreover, there was testimony that appellant told Amy Thomas that she only wanted occasional visitation with L.D.  Furthermore, there was evidence that appellant was in a dysfunctional relationship that had involved domestic violence.

**{¶68}** With respect to L.D.'s best interest, there was testimony that she was doing well in foster care and was bonded with her foster family, which also included two other children. L.D. had been in the same foster family since October of 2009 and there was testimony that the foster family wished to adopt her. The Guardian Ad Litem, in a report filed on August 25, 2010, indicated that she thought that it was in L.D.'s best interest for permanent custody to be granted. The Guardian Ad Litem noted that L.D. was very adoptable and was bonded with her foster family, who loved her.

**{¶69}** Based on the foregoing, we find that the trial court did not err in finding that it was in L.D.s best interest for permanent custody to be granted to SCDJFS.

**{¶70}** Appellant's two assignments of error are, therefore, overruled.

**{¶71}** Accordingly, the judgment of the Stark County Court of Common Pleas, Family Court Division, is affirmed.

By: Edwards, J.

Gwin, P.J. and

Wise, J. concur

_____

_____

_____

JUDGES

JAE/d0404

[Cite as *In re L.D.*, 2012-Ohio-1810.]

IN THE COURT OF APPEALS FOR STARK COUNTY, OHIO

FIFTH APPELLATE DISTRICT

IN THE MATTER OF:     :
            :
  L.D.        :
            :
            :
            :   JUDGMENT ENTRY
            :
            :
            :
            :   CASE NO. 2012CA00006

For the reasons stated in our accompanying Memorandum-Opinion on file, the judgment of the Stark County Court of Common Pleas, Family Court Division, is affirmed.  Costs assessed to appellant.

_____

_____

_____

         JUDGES